UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 06 C 5355 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| NORTHERN STATES INVESTMENT, INC., and ) | |
| LASALLE NATIONAL BANK, as Trustee for ) | |
| Land Trust No. 10-17758-9, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court are parties' cross-motions for summary judgment, Defendants' motion to exclude certain material facts, and Defendants' motion to strike parts of the United States' memorandum of law in response to Defendants' motion for summary judgment. For the reasons stated below, the United States' motion for summary judgment is denied, Defendants' motion for summary judgment is denied, and Defendants' motion to exclude is denied as explained in this order or is otherwise denied as moot. Defendants' motion to strike is also denied.[1]

**I. BACKGROUND**[2]

---

[1] Defendants have moved to strike particular statements found within the United States' memorandum of law in response to Defendants' motion for summary judgment on the theory that they are inadmissible under the Federal Rules of Evidence. Defendants' motion is denied. "[A]rguments in briefs are not evidence," *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 n.5 (7th Cir. 1985), and the court can neither admit nor deny as evidence any statements found therein.

[2] The facts are taken from the parties' Rule 56.1 statements of material fact and are undisputed unless otherwise noted. The court further notes that both parties failed to comply with different sections of the court's standing order regarding the filing of summary judgment motions, with one party failing to properly bind and tab all exhibits in support of the 56.1 statement, and the other failing to limit the 56.1 statement of facts to short, factual statements.

This is a federal tax lien foreclosure case stemming from assessments for various years from 1978 to 1987 against Robert B. Horsting, Sr. and Margaret M. Horsting (collectively, "Horsting parents"). The United States seeks to foreclose against real property located at 1727 Sunset Ridge Road in Glenview, Illinois ("the 1727 property"). This action is brought against Northern States Investment, Inc. ("NSI") and LaSalle National Bank ("LSNB"). LSNB is trustee of the 1727 property, and NSI possesses the beneficial interest in the 1727 property. The Horsting parents never held actual title to the 1727 property, but the United States argues that NSI was the alter ego or nominee of the Horsting parents.

Margaret passed away in 2003, and Robert, Sr. passed away in 2005. The Horsting parents are survived by five children who are indirectly involved in this action as shareholders, officers, and directors of NSI. The children are all of age. They are, in order from oldest to youngest, Robert B. Horsting, Jr., Richard E. Horsting, David P. Horsting, Laurie Horsting Kiddell, and Susan Horsting.

The history of the 1727 property involves some complication. Prior to residing in the 1727 property, the Horsting family resided at 1617 Sunset Ridge Road, in Glenview, Illinois ("the 1617 property"). It is unclear when the Horstings moved into the 1617 property, but in 1964 the 1617 property was held in trust by the Exchange National Bank of Chicago in Trust No. 17758 (the "land trust"), with the beneficial interest held by William A. Nott and to be transferred to Margaret upon Nott's death, unless Nott had previously sold, assigned, transferred or otherwise disposed of the interest. Prior to the Horsting's departure from the 1617 property, Nott assigned his interest in any sale of the 1617 property to Margaret. The 1617 property is not a part of this action.

In 1968, title to the 1727 property was conveyed to the same land trust that held title to the 1617 property. Robert, Sr., and Nott (who still held the beneficial interest in the land trust) signed the closing statement.[3] The land trust executed a $34,000 mortgage to cover the costs of this conveyance, and Robert, Sr., Margaret, and Nott (as well as Elizabeth Nott), gave their personal guarantees on the mortgage.[4] The Horsting family moved into the 1727 property in late 1968.

On March 19, 1979, more than ten years after the Horsting family moved into the 1727 property, Robert, Sr. incorporated NSI and assigned his interest in NSI to his five children via a document entitled "Assignment By Incorporator."[5] Since March 19, 1979, and continuing to present, NSI has been owned equally by the five Horsting children. On March 19, 1979, shares were issued to the five children, and Robert, Jr., Richard, and David were named as the Board of Directors of NSI via a document titled "Written Unanimous Consent to Corporate Action by Shareholders." On April 3, 1979, Robert, Jr. was named the President, Richard the Vice President, and David the Secretary and Treasurer of NSI, pursuant to a document titled "Written Unanimous Consent of Corporate Action by Directors." The same day, Nott conveyed his beneficial interest in the land trust (and, therefore, in the 1727 property) to NSI. At this point,

---

[3] Defendants object that the closing statement is inadmissible hearsay. The objection is overruled. The document is a legal contract, constitutes a verbal act, and is not admitted for the truth of the underlying matters asserted. *See Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007).

[4] Defendants object that evidence of the Horsting parents' personal undertaking is inadmissible hearsay. This objection is overruled. The document, labeled "Personal Undertaking on Land Trust Loan" is a verbal act and is admitted not for the truth of the matter asserted. *See Schindler*, 474 F.3d at 1010.

[5] The youngest children, Laura and Susan, were minors at the time, and their interests were assigned to Robert, Jr., as custodian, pursuant to the Illinois Uniform Gifts for Minors Act.

Robert, Sr. was not formally involved in the functioning of NSI, but when Attorney Robert Dini sent the Exchange National Bank of Chicago an original and two copies of the April 3, 1979 conveyance from Nott to NSI on July 24, 1979, the letter was copied to Robert, Sr.[6]

The parties dispute whether Nott received any compensation for this conveyance. If Nott received any consideration, it came from Robert, Jr., and not from NSI. Defendants argue, pursuant to Robert, Jr.'s affidavit and deposition, that Robert, Jr., compensated Nott.[7] The United States argues to the contrary, and points to an interview of Robert, Jr., conducted in 1989 by IRS Revenue Officer Chester Baer, during which Robert, Jr. is reported to have stated that he had no knowledge of any consideration given to Nott.[8]

The parties also dispute whether any rent was paid by the Horsting parents to NSI.[9] The United States alleges that no rent was paid, citing the deposition of Richard. Defendants "deny" in their 56.1 response without any citation to the record. However, an affidavit and deposition

---

[6] The court does not know who Attorney Dini represented in this matter.

[7] Defendants also cite to a purported receipt written by hand of Nott, dated Oct. 12, 1983, which states that "[o]n or about April, 1979, Robert Horsting, Jr., President of Northern States Investments, Inc., paid me in full for my equity interest in the [1727 property]." Def. Proposed Ex. 4. The United States objects that no foundation for the document has been provided. The court agrees, and will not admit the exhibit at this time. Nevertheless, as noted in the text, Robert Jr. testified to more or less the same in his deposition and affidavit (though there are inconsistent dates in these two documents), which the court does consider for purposes of this order. *See* Def. Proposed Ex. 22.

[8] Defendants object to this report on hearsay grounds. It is not hearsay as it is not being considered for the truth of this assertion.

[9] Defendants attached to their statement of facts an undated "lease" which states, *inter alia*, that the Horsting parents will pay "rent" calculated as the amortized mortgage for the 1727 property, plus certain other taxes and utilities, and which appears to be signed by Robert, Jr., as representative for NSI, and by Margaret. Def. Proposed Ex. 8. The United States objects that this document has not been properly authenticated. The court sustains the United States' objection and will not consider this exhibit for purposes of this motion.

4

from Robert, Jr. does lend some support to the claim that the Horsting parents paid at least some rent.

Before and after the beneficial interest in the 1727 property was conveyed from Nott to NSI, various liabilities against the 1727 property and personally against Robert, Sr., were lodged by both creditors and the federal government.[10] In 1969 two liens were recorded against the 1727 property for over $8,500; the court is unaware of the disposition of these liens.[11] From 1973 to 1990, seven civil judgments were entered against Robert, Sr., and other defendants, for a cumulative sum of over $500,000.[12] The IRS filed tax assessments against the Horsting parents for the years 1978 to 1983 and 1987. These assessments went unpaid despite notice, and the sum of $2,174,211.91 remained due as of April 15, 2008.

Several other facts regarding the functioning of NSI as a corporation and the personal practices of the Horsting parents are relevant. NSI was never intended to make a profit, has never had any capital, and has never paid a return on capital to its shareholders. It has never conducted any business, had any income, or had a checking account. State and federal tax

---

[10] Defendants object to introduction of evidence related to creditor liens and civil judgments on grounds of relevancy, prejudice, and hearsay. The court overrules each of these objections. Parties stipulated that hearsay and prejudice grounds would be waived as to these facts. The court further finds that these facts are relevant to this case, for they do provide at least some circumstantial evidence that the Horsting parents had an incentive to attempt to shield their property from creditors.

[11] In 1969, Exchange National Bank received two notices of mechanic's liens of $4,355.58 and $4,445.92.

[12] In 1973 a civil judgment was entered for $4,596.83. In 1981 a civil judgment was entered for $50,718.75. In 1982 a civil judgment was entered for $48,014.52. In 1985 a civil judgment was entered for $40,403.88. In 1986 a civil judgment was entered for $125,461.25. In 1990 two civil judgments were entered for over $180,000 and for $62,017.18. Although many of these judgments were against multiple defendants, there is no suggestion from the record that Robert, Sr., was not jointly liable for each judgment.

returns have never been filed on NSI's behalf, and NSI has never entered into contracts or ever written correspondence. Although there was an outstanding mortgage on the 1727 property, payments were never made by NSI but were made by Margaret via checks drawn on an account in the name of Margaret's mother.[13] Indeed, the Horsting children do not recall that their parents ever had a personal checking account in their own name. Finally, various taxes on the 1727 property, as well as the utilities for the property, were paid through a combination of contributions from the Horsting parents and children; none were paid by NSI.

The efficacy and care of NSI officers is also of question. Robert, Jr., who is President of NSI and is on the board of directors, testified that he is not aware of the difference between an "officer" and a "director" of a corporation, and he has not been involved in the incorporation of any other entity. In 1983, an NSI Annual Report was filed with the Secretary of State that (i) states that NSI was engaged in the business of "investment banking," although all parties agree this is untrue; (ii) incorrectly labels the offices held by David and Richard; and (iii) incorrectly identifies Laurie and Susan as directors when they are actually only shareholders.[14] David, the NSI Secretary and Treasurer, further testifies that he did not sign two NSI documents although his signature appears on the forms, including a corporate resolution for NSI dated April 10, 1979 permitting the three officers and directors of NSI to act on behalf of NSI *vis-à-vis* LSNB,[15] and

---

[13] Defendants object to the admission of certain cashed checks under Rules 106, on grounds of relevancy, and on hearsay grounds. The parties stipulated that this evidence was admissible except for hearsay grounds. The court overrules Defendants' objection, for the checks constitute admissible verbal acts. *See Schindler*, 474 F.3d at 1010.

[14] The court is unaware of what was reported on other "Annual Reports."

[15] The court is unaware of when or how the land trust was transferred from Exchange National Bank to LaSalle National Bank. This appeared to occur at some point in or about 1979. Regardless, both parties agree that LaSalle National Bank now holds title to the land trust.

an "Amendment of Trust Agreement" dated June 20, 1984, which continues the trust agreement between NSI and LSNB. Also, none of the Horsting children were aware that the 1727 property had an outstanding mortgage against it at the time it was conveyed to NSI. Laurie and Susan did not learn of the existence of NSI until after their parents had passed away.

## II. ANALYSIS

### A: Standard of Review

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1124 (7th Cir. 2008). If a reasonable jury could return a verdict for the nonmoving party, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court must view the facts and any inferences to be drawn from them in the light most favorable to the non-moving party. *See Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). "On cross-motions for summary judgment, [a court] construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration was made." *Five Points*, 542 F.3d at 1124.

In seeking a grant of summary judgment, the moving party must identify pleadings, depositions, and other documentary evidence that shows that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Montano v. City of Chicago*, 535 F.3d 558, 568 (7th Cir. 2008). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In response, the non-moving party may not rest solely on its pleadings, but must

7

designate specific material facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324. "Summary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996) (quoting *Buckley Dement, Inc. v. Travelers Plan Adm'rs of Ill. Inc.*, 39 F.3d 784, 787 (7th Cir. 1994) and *Celotex Corp.*, 477 U.S. at 322)).

**B.     Applicable law of federal tax liens.**

Federal tax liens attach to "all property and rights to property, whether real or personal," of the taxpayer. 26 U.S.C. § 6321. The lien is a "continuing lien," and therefore attaches to all property owned by the taxpayer during the life of the lien. *Glass City Bank v. United States*, 326 U.S. 265, 267 (1945).

The choice of law in determining what property can be attached by a federal tax lien is not without complication. The property rights of the taxpayer are determined by state law. *United States v. Swan*, 467 F.3d 655, 656 (7th Cir. 2006) (citing *Drye v. United States*, 528 U.S. 49, 58 (1999)). This is necessary since a "federal statute creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *Id.* (quoting *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985)). However, federal law "determines whether those rights are the sort of rights to which a lien attaches." *Id.* (quoting *United States v. Craft*, 535 U.S. 274, 278–79 (2002)).

The United States presents two theories as to how a tax lien against the Horsting parents permits attachment to NSI's beneficial interest in the 1727 property. The first theory is that NSI is the alter ego of the Horsting parents. It is clear that federal tax liens can attach to property held by an alter ego. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977).

8

Although the parties dispute whether state or federal law is controlling in determining alter ego status,"there do[es] not appear to be any relevant differences between state and federal law" on this issue. *Swan*, 467 F.3d 656 (referring to, *inter alia*, alter ego theory under federal and Illinois law).

There is no strict test for alter ego status; the primary question is whether or not the corporation is a "sham," meaning that there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378–79 (7th Cir. 2008) (applying Illinois law) (citations omitted). Evidence may include but need not be limited to (1) inadequate capitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of the debtor corporation; (5) nonfunctioning of the officers or directors; (6) absence of corporate records; (7) commingling of funds; (8) failure to maintain arm's-length relationships among related entities; and (9) whether, in fact, the corporation is a mere facade for the operation of the dominant interest. *See id.* at 379 (citations omitted). A family relationship between corporate officers and the taxpayer is also a factor to consider. *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 289 (8th Cir. 1993).[16]

---

[16] The alter ego theory is usually applied to a relationship between a corporation and its officers, directors, or shareholders. The Horsting parents hold none of these positions *vis-à-vis* NSI. However, the court does not understand the multi-factor concept of the alter ego theory to be so rigid as to apply only to these formal circumstances, and does not believe the Horsting parents' lack of a formal title precludes a finding of alter ego status if the other key factors are satisfied. *See Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 729 (11th Cir. 1989) (holding same for nominee status); *F.P.P. Enterprises v. United States*, 830 F.2d 114, 118 (8th Cir. 1987) (finding alter ego status without officer or director relationship between taxpayers and a trust).

The United States separately alleges that NSI is the "nominee" of the Horstings. Again, this creates a choice of law dilemma. Both parties agree that Illinois law does not provide a clear standard for nominee status. The nominee theory is fundamentally inquiring into whether the taxpayer is the realistic owner of the property, such that the party with legal title is merely the nominee of the taxpayer. *See Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000) ("A nominee theory involves the determination of the true beneficial ownership of property."). Illinois courts agree with this analysis, if not the label, for they determine ownership with a "realistic approach" and not a strict formula. *Chicago Patrolmen's Ass'n v. Dep't of Revenue*, 664 N.E.2d 52, 57 (Ill. 1996) (citations omitted), *abrogated on other grounds by Carpetland U.S.A., Inc. v. Ill. Dep't of Emp. Security*, 776 N.E.2d 166 (Ill. 2002).

Though nominee and alter ego theories are independent, they can be interrelated. *See Oxford Capital Corp.*, 211 F.3d at 284. Circumstances may exist where a party could be a nominee without necessarily being an alter ego, for example, in the instance of a fraudulent conveyance. *See Swan*, 467 F.3d at 658. However, in this case the two theories are so intertwined as to involve an identical examination. NSI could be the nominee of the Horsting parents only if NSI is the alter ego of the Horsting parents, for only then would the Horstings be deemed to have true control over the 1727 property. Though minor differences may exist between these theories, they are not material to the court's examination.

Finally, this legal landscape is slightly complicated by the fact that NSI holds only a beneficial interest in the 1727 property, not actual title. Under Illinois law, a land trust beneficiary possesses only *personal property* interests in the proceeds of the realty; both legal and equitable title are in the trustee (here, LSNB). For purposes of federal law, however, this limitation is not controlling. Again, property rights are defined by state law, but federal law

determines whether the lien may attach to those rights. *Swan*, 467 F.3d at 656. Under Illinois state law, the beneficiary interest has full property rights, including conveyance of said property. 765 Ill. Comp. Stat. 405/1. Under federal law those rights may be attached by the lien. 26 U.S.C. § 6321; *cf. Matter of Gladstone Glen*, 628 F.2d 1015 (7th Cir. 1980) (same under bankruptcy statute). If NSI is in fact the alter ego or nominee of the Horsting parents, then the lien against the Horstings may attach to the property controlled by NSI.

C.     **United States' Motion for Summary Judgment.**

Because determining alter ego status requires consideration of the totality of the circumstances, the materiality of any particular fact that is at issue will not become clear until it is weighed against all the other relevant facts. With the caveat that any fact discussed in this section, as well as any inferences that can be drawn from the facts, will be construed in the light most favorable to Defendants, the following four-step approach is appropriate. First, undisputed facts that call into question the legitimacy of NSI will be considered. Next, facts which are relevant to the inquiry but which do not necessarily cast doubt upon NSI will be identified. Finally, facts which are at issue, and which support the legitimacy of NSI, will be examined. The materiality of these facts will then be considered.

The record contains many undisputed facts that call the legitimacy of NSI into question. NSI was not capitalized *at all*, notwithstanding an existing mortgage on the 1727 property to which NSI was assigned a beneficial interest. Various corporate formalities were completely disregarded: NSI had no checking account and did not make tax and mortgage payments on the 1727 property; the NSI corporate log book does not have any entries since 1979; certain NSI documents appear to have NSI officer signatures that the officer denies ever having made; representations made to the Secretary of State about NSI have been made in error (including

11

reporting the purpose of NSI, the office holders, and the directors); the officers in NSI have played little or no role in NSI's functioning since 1979; and the NSI shareholders were not even aware that the 1727 property was encumbered with a mortgage when it was conveyed to NSI. The role of the Horsting parents in acquiring the 1727 property also supports the notion that they were in control of NSI, and ultimately the 1727 property. The Horsting parents signed the closing statement on the 1727 property and provided a personal guarantee on the mortgage undertaken by the land trust to possess the 1727 property. Robert, Sr., incorporated NSI. Each of these are significant factors that suggest that NSI could very well be a sham.

Other facts are relevant but are neutral given that they must be viewed in the light most favorable to Defendants. First, Robert, Sr. faced significant liabilities during this time, both already assigned and reasonably foreseeable, and their children do not recall them having a checking account in their name. This could be evidence that the Horsting parents were attempting to shield their assets from creditors, including their interest in the 1727 property, but it also could be viewed as being unrelated to NSI's status. Second, Robert, Sr., assigned NSI to, and NSI was managed by, the Horsting children, who even today appear ill-equipped to handle the duties and obligations expected of corporate officers. The NSI officers agreed to receive assignment of the 1727 property, but they were not even aware that the property was encumbered by a mortgage at that time (which the Horsting parents were both paying and guaranteeing). These factors could support the United States' claim that the Horsting parents had the primary interest in the property and retained control,, but when viewed in the light most favorable to Defendants, they can also be considered as neutral curiosities.

Next there are two facts which seem particularly relevant, which are at issue, and which can be viewed to support the independence of NSI. The first is whether Nott received

12

compensation when he conveyed the beneficiary interest in the 1727 property to NSI. Defendants have provided some evidence that compensation was paid to Nott by Robert, Jr., such that the conveyance of the 1727 property could be viewed as an arms-length negotiation. The United States argues that this is untrue, and is immaterial in any event, for even if Horsting Jr. made such a payment, it was not from NSI. The court at this stage cannot agree. Robert, Jr. is the President of NSI, and construing the facts in favor of Defendants, a fact-finder could conclude that any compensation paid by Robert, Jr. was made on behalf of NSI rather than in his individual capacity. If accepted as true, this would undercut the notion that NSI was not itself the true owner of the 1727 property.

Second, there is an active dispute regarding whether the Horsting parents paid any rent to NSI for the 1727 property. The United States alleges that no rent was paid, and cites to the deposition of Richard, where he testifies as follows:

> Q: Did your parents ever pay any rent to Northern States Investments?
> A: Not to Northern States Investments. They would pay us money when they could; but, to be honest with you, once I got out of college—it was probably around 1985 or so—I had just gotten divorced and that's when my mother was desperately asking for money, and I think from 1980—the end of 1985 through 2001 I paid my mother a monthly stipend just to get by.

Richard Dep. 20:21–21:6 (attached to U.S. 56.1 statement of facts). Defendants Rule 56.1 response to the proposed fact that the Horsting parents "have never paid any rent to NSI" is simply the word "Deny," without any citation to the record. Generally such unsupported denials are to be disregarded and the fact is deemed admitted. *See* Local Rule 56.1. However, Defendants did include within their own submission some evidence that supports their position. In particular, they attached an affidavit from Robert, Jr., which states that ""Robert B. Horsting, Sr. and Margaret M. Horsting paid the rent and nominal utilities with their social security checks

13

and contributions from Robert Jr., Richard, Susan and Laurie Horsting," Robert, Jr., Aff. ¶ 7, Def. Ex. 22. Robert, Jr.'s affidavit is somewhat corroborated by his deposition by the United States:

> Q: When you say they paid us rent, do you really mean that they paid Susan?
> . . . . My question is, did they pay Susan?
> A: They paid Northern States Investments, but Susan is part of Northern States Investments.

Robert, Jr., Dep. 48:2–19 (attached to United States 56.1 statement of facts).[17]

Parties are not permitted to create issues of material fact "simply by contradicting . . . [a] previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition)." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07 (1999). Robert, Jr.'s affidavit appears to "flatly contradict" Richard's deposition testimony, but it is also somewhat supported by Robert, Jr.'s deposition testimony. The court at this stage can only identify issues in dispute; it may not weigh the evidence. Given these conflicting depositions, a reasonable fact-finder could find that at least some rent was periodically paid by the Horsting parents. This would undercut the notion that the Horsting parents were the actual owners of the 1727 property.

Considering all relevant facts, the disputes over compensation for conveyance of the property and payment of rent are material. Determination of alter ego status is based on the totality of the evidentiary record. Although many of the corporate formalities regarding NSI were egregiously disregarded, and although the Horsting parents' role in obtaining and controlling the 1727 property seems significant, the court cannot say that a reasonable fact-finder

---

[17] Robert, Jr., appears to continue discussing these issues on page 49 of the deposition, but the United States submitted only an excerpt from his deposition that does not include that page. The court is left only with his concluding statement that rent was "paid to Northern States Investments."

could not side with Defendants after concluding that adequate compensation and adequate rent was paid.  The United States' motion for summary judgment is denied.

D.     **Defendants' Motion for Summary Judgment.**

Defendants' motion for summary judgment is denied.  When construing the material facts *against* Defendants, a reasonable fact finder could conclude that NSI was an alter ego of the Horsting parents.

### III.  CONCLUSION

For the foregoing reasons, parties' cross-motions for summary judgment are denied, Defendants' motion to exclude is denied as described in this order or is otherwise denied as moot, and Defendants' motion to strike is denied.

ENTER:


/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED:   December 05, 2008