UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 5355 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| NORTHERN STATES INVESTMENTS, INC. | ) | |
| And Chicago Title & Trust, as Successor Trustee to | ) | |
| LASALLE NATIONAL BANK, as Trustee for | ) | |
| Land Trust No. 10-17758-9, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

The government brought this federal tax lien foreclosure case against Robert B. Horsting, Sr. and Margaret M. Horsting (collectively, the "Horsting parents") stemming from assessments for several years between 1978 and 1987. On September 8, 1997, judgment was entered in favor of the government and against the Horsting parents with respect to income tax liabilities from the above-described period. *See* Case No. 97-C-4169.

In this case, the government seeks to foreclose against real property located at 1727 Sunset Ridge Road in Glenview, Illinois (the "1727 property"), which the Horsting parents occupied for several decades. The Horsting parents never held title to the 1727 property; rather, title to the 1727 property was held in trust of which, beginning in 1978, defendant Northern States Investments, Inc. ("NSI") was beneficiary. The government's theory is that NSI was either the alter ego or nominee of one or both of the Horsting parents, and therefore that the tax liens associated with the assessments against the Horsting parents should attach to the 1727 property and the proceeds of the sale thereof. The court conducted a two-day bench trial in June 2009. The parties submitted pretrial motions *in limine* and post-trial proposed findings of fact and conclusions of law which

were fully briefed on August 14, 2009.  The government also submitted a motion for an order pursuant to Fed. R. Civ. P. 56(d)(1).[1]

For the reasons that follow, the court rules in favor of the government.  The Court makes its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT

### A.    The 1617 Property

Before residing at the 1727 property, the Horsting parents lived with their five children–from oldest to youngest, Robert B. Horsting, Jr., Richard E. Horsting, David P. Horsting, Laurie Horsting Kiddell, and Susan Horsting (the "Horsting children")–at 1617 Sunset Ridge Road, also in Glenview, Illinois (the "1617 property").  As of 1964, the 1617 property was held in trust by the Exchange National Bank of Chicago in Trust No. 17758 (the "land trust"), with the beneficial interest held by William A. Nott, a friend of the Horsting parents.  In the case of Nott's death, the land trust was to be transferred to Margaret Horsting (provided that Nott had not otherwise alienated his beneficial interest).

On August 1, 1968, when the Horstings were planning to move from the 1617 property, Nott directed the land trustee to pay Margaret the proceeds of the sale of the 1617 property.

---

[1] The government's motion is denied.  In its summary judgment opinion, the court made several preliminary evidentiary rulings.  In pretrial filings and at trial, the parties objected to the exclusion of various documents and testimony.  Given the relatively limited scope of the trial and the reservation of certain evidentiary rulings until trial, the court declines to exercise its discretion under Fed. R. Civ. P. 56(d)(1).  The court's rulings on the evidentiary objections are addressed within.

**B.    Acquisition of the 1727 Property**

On July 22, 1968, the trustee for the land trust took title to the 1727 property. Two weeks earlier, Margaret Horsting completed an Application for Loan, seeking a loan of $34,000 for the purchase of the 1727 property.  In completing the application, Margaret made several misstatements regarding her income.  While there is no evidence that she ever submitted this application, the Exchange National Bank of Chicago, as then-trustee of the land trust,[2] executed a note and mortgage in the amount of $34,000 on the same day that the land trust took possession of the 1727 property.  On August 1, 1968, Nott, the Horsting parents, and Nott's wife each signed a Personal Undertaking on Land Trust Loan, obligating them to pay any indebtedness on the note and mortgage.  At the closing of the 1727 property, a Closing Statement was executed, which Robert, Sr. signed, acknowledging his receipt.

The Horsting family moved into the 1727 property in December 1968.

---

[2]     The evidence presented is conflicting as to when defendant LaSalle National Bank became the trustee for the land trust.  The government's Exhibit 31 suggests that the transfer may have been as early as 1979, but the government's Exhibit 41 suggests that the transfer may have come after 1982.  Regardless, the parties agree that LaSalle now holds title to the land trust.

3

### C.  NSI

#### 1.  Incorporation

In early 1979, when the Horsting parents, Laurie, and Susan were still living at the 1727 property, Robert, Sr. incorporated NSI.[3]  On March 19, 1979, Robert, Sr. assigned his interest in NSI to his five children, with Robert, Jr. acting as custodian for Laurie's and Susan's interests.  That same day, Robert, Jr. and David Horsting, on behalf of NSI, issued an equal number of shares to each of the five Horsting children.  Robert, Sr. watched as Robert, Jr. and David issued the shares.  Over the next several weeks, NSI took additional corporate actions, including selecting Robert, Jr. as President, Richard as Vice President, and David as Secretary and Treasurer.  NSI has remained equally owned by the Horsting children since 1979.

On April 3, 1979, Nott conveyed his beneficial interest in the land trust (and, therefore, in the 1727 property) to NSI via an Assignment.  Subsequently, attorney Robert Dini notified the trustee of Nott's conveyance by a July 24, 1979 letter, copying Robert, Sr. (but no shareholder of NSI) on the letter.[4]  Neither of the Horsting parents was subsequently involved in NSI's corporate matters (of which, as detailed below, there were few), although, also as described within, they took several actions with regard to the 1727 property.

---

[3]
    Robert, Jr. testified that he had the idea to set up NSI, incorporated NSI, and did not tell the Horsting parents about NSI until sometime later.  An Assignment by Incorporator signed by Robert, Sr. on March 19, 1979 contradicts Robert, Jr.'s second and third assertions, making his first assertion less credible.

    Robert, Jr. also testified that he wanted to set up NSI so that he would qualify for an additional mortgage on a home in which he planned to live with his wife.  In the absence of documentary evidence, the court does not find this testimony persuasive, particularly given the unequivocal Assignment by Incorporator signed by Robert, Sr.

    Robert, Jr. testified that he retained Dini, but he is not copied on this letter, and there is no other evidence of any communications or relationship between the two.

4

## 2. Consideration for the 1727 property

Nott did not convey his interest in the land trust in exchange for consideration from NSI. At trial, Robert, Jr. claimed that he personally paid consideration for the interest. Robert, Jr. testified that Nott repeatedly threatened to evict the Horsting parents from the 1727 property for non-payment of rent, and that he (Robert, Jr.) paid Nott a total of $34,000 for the 1727 property. According to Robert, Jr.'s testimony, these payments included: $28,000 in January 1977, which Robert, Jr. testified that he paid from the proceeds of the sale of his grandmother's house;[5] and two payments of $3,000, the latter of which was made in early 1979, shortly before NSI was incorporated. Robert, Jr.'s testimony was the only admissible evidence in support of these payments.[6]

However, Robert, Jr. was inconsistent on the details of this transaction. When

---

[5]

David Horsting testified that no one besides Robert, Jr. told him that Robert, Jr. received any of the proceeds of the sale of their grandmother's house.

[6]

NSI sought to introduce further testimonial and documentary evidence of Robert Jr.'s payments. However, as explained within, each such piece of evidence proved inadmissible.

First, NSI sought to introduce Richard's testimony regarding the sale of the grandmother's house and the use of the proceeds thereof. The government objected that Richard's testimony constituted inadmissible hearsay, as the basis for his testimony was conversations with Nott and others. The government's objection is sustained.

NSI also sought to introduce two pieces of documentary evidence to bolster Robert, Jr.'s testimony regarding consideration paid for the 1727 property. First, NSI offered its Exhibit 7, which is a statement written in 1983 by William A. Nott and which says, "On or about April 1, 1979, Robert B. Horsting Jr., President of Northern States Investments, Inc., paid me in full for my equity interest in the property located at 1727 Sunset Ridge Road, Glenview, Illinois." The statement says at the bottom: "Total $34,000." At trial, the government objected that this note constitutes hearsay. NSI responded that the note was a verbal act. A verbal act, such as a contract, is not hearsay because it is not offered to prove the statements contained therein. *See, e.g.,* *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). Exhibit 7 cannot be construed as a contract, particularly considering it was executed more than four years after Nott's conveyance, and does not affect the legal rights of Nott or Robert, Jr. The note is relevant only for the truth of the matter asserted–*i.e.*, that Robert, Jr. paid Nott for Nott's conveyance of his interest in the 1727 property. Therefore, Exhibit 7 is excluded.

NSI also used its Exhibit 15 at trial as a demonstrative exhibit. Exhibit 15 is a list of Robert, Jr.'s expenses, apparently relating to NSI. In the Final Pretrial Order, the government objected to Exhibit 15, contending it was inadmissible hearsay. NSI did not respond to the hearsay objection. The list is an out-of-court statement, and has no relevance except as evidence of the truth of the matter asserted. It is inadmissible hearsay. Fed. R. Evid. 802.

For his part, Robert, Jr. did provide further testimony in support of his claim to have paid Nott for the interest in the 1727 property. According to Robert, Jr., Nott threatened to evict the Horsting parents unless Robert, Jr. purchased the house.

IRS Revenue Officer Chester Baer interviewed Robert, Jr. in 1989, Robert, Jr. stated that he was unaware of any consideration paid to Nott for the beneficial interest in the land trust, whether by NSI or by anyone else.[7]  Moreover, Robert, Jr.'s testimony is undermined by Nott's conveyance of the property to NSI (rather than to Robert, Jr. who testified that he, not NSI, paid Nott for the 1727 property) and the more than one month that elapsed between Robert, Jr.'s supposed final payment on the 1727 property and Nott's conveyance.  Robert, Jr. has been similarly inconsistent with regard to the details of his initial $28,000 payment to Nott.  At trial, he testified that he endorsed the check directly to Nott at the closing, while he previously testified in his deposition that the payment was made without a check passing from him to Nott.  Finally, although the beneficial interest in the land trust was transferred to NSI, there is no evidence that NSI reimbursed Robert, Jr.

In sum, the court finds that neither NSI nor Robert, Jr. paid any consideration for the beneficial interest in the land trust.

---

[7]     At trial, Robert, Jr. was asked about the same conversation with Officer Baer, and (without elaboration) denied telling Officer Baer that he had no knowledge of money paid to Nott for the 1727 property.

### 3.    Lack of formalities

NSI failed to observe corporate formalities nearly from its inception.  On April 10, 1979, NSI executed an authorization for Robert, Jr., Richard, and David to act on its behalf with respect to the trustee; although David's signature appears twice on the authorization, he denied ever signing it.[8]  In 1983, NSI filed an Annual Report with the Illinois Secretary of State that misidentifies Laurie and Susan as directors (rather than shareholders), misidentifies the offices held by Richard and David, falsely states that NSI's business was "investment banking," and falsely states that NSI had $1,000 in capital.[9]  The next year, NSI executed an Amendment of Trust Agreement which contains David's signature but which, like the 1979 authorization, David denied signing.  This Amendment is one of the few corporate actions taken by NSI after 1979, as there is no subsequent entry in the corporate minute book, and the shareholders made no record of any meetings.  Robert, Jr.–the President of NSI and, from all appearances, the Horsting child most involved in NSI–testified that he did not know the difference between corporate directors and officers, and there is no indication that any of the Horsting children knew of or observed such distinctions.[10]

NSI's business activities and records were similarly wanting.  The corporation was not initially infused with any capital, and never had any capital at any time during its

---

[8]        Robert, Jr. conceded that "[t]here is a chance that I might have signed" David's name to NSI documents.  Tr. 47:9-10.

[9]        There is no indication that NSI completed or filed an Annual Report for any other year of its existence.

[10]        It is unclear when and to what extent Laurie and Susan were informed of their respective stakes in NSI, but it is clear that they had no involvement in NSI's corporate governance.  At her deposition, Susan testified that she was first told about NSI in 2006, but Robert, Jr. testified that he told Susan and Laurie about NSI in the mid-1980s.  In any case, the sisters' signatures do not appear on any NSI documents, and there is no suggestion that they were involved in NSI's corporate matters.  (As discussed within, Susan had extensive involvement with payments on the 1727 property, which was owned by the land trust, in which NSI had a beneficial interest.)

7

existence. NSI has conducted no business of any sort, and has never employed anyone, written any correspondence, entered into contracts, received any income, or maintained a regular mechanism to pay bills, such as a checking account. NSI did not file any state or federal income tax returns until 2008. NSI did pay expenses of filing with the Illinois Secretary of State, but paid no other expenses. Unsurprisingly, NSI was not intended to make a profit, and has never made any disbursements to its shareholders, the five Horsting children.

Rather, NSI existed to ensure that the Horsting parents and Susan and Laurie, who were minors at the time of NSI's incorporation and acquisition of the beneficial interest in the land trust, could continue to live in the 1727 property. Even in this, though, NSI took no action. NSI paid no real estate taxes, property insurance, utilities, or other bills. Instead, as described within, checks from an account held by Susan Horsting and from one held by Margaret Horsting's mother covered household expenses.[11]

### D. The Horsting parents and the 1727 property

Margaret Horsting lived at the 1727 property until her death in 2003, while Robert, Sr., lived there until his death in 2005. Robert, Sr. signed that he received a copy of the closing statement, presumably shortly after the closing. While the Horsting parents were living at the 1727 property, it was subject to a mortgage, which the Horsting

---

[11] Robert, Jr. was mistaken in his deposition testimony as to several facts regarding the payments pertaining to the 1727 property. For example, Robert, Jr. initially testified that NSI paid real estate taxes–presumably on the 1727 property–but then admitted that NSI paid no taxes, and instead asserted that he and Susan Horsting paid the real estate taxes in question. Robert, Jr. testified at trial that he paid all of the real estate taxes before 1990, after having testified at his deposition that Susan paid those bills during that period. He also testified that Susan did not have a checking account until after the Horsting parents' deaths, but later conceded that she had an account as far back as the 1980s. Documentary evidence shows that checks from Susan's account paid some real estate taxes on the 1727 property. However, no documentary evidence exists to support Robert, Jr.'s claims that he paid taxes, save for his payment of real estate taxes after the Horsting parents' deaths.

parents guaranteed personally. After the formation of NSI, Margaret paid this mortgage by a series of checks drawn on a checking account held by Margaret's mother, Margaret M. Laubach, after Ms. Laubach's death in the mid-1980s.[12] None of the Horsting children knew about this mortgage until after their parents' death.

Susan Horsting continued to live at the 1727 property until the Horsting parents' deaths.[13] Once the IRS closed their checking accounts, the Horsting parents deposited their Social Security checks into a checking account held in Susan's name. Susan received bills for the real estate taxes for the 1727 property in her name, and wrote checks on a bank account in her name to cover the utilities, real estate taxes,[14] and property insurance on the 1727 property. After the Horsting parents' deaths, Robert, Jr. and Richard paid over $56,000 in unpaid real estate taxes on the 1727 property. Susan's continued occupancy of the 1727 property and checks for real estate taxes, along with a Leasehold Agreement pursuant to which there is little evidence of rent actually being paid, are the only facts showing that the Horsting children exercised control over the 1727 property during the Horsting parents' lifetime.[15]

---

[12]

Neither Horsting parent had a checking account after the IRS closed a checking account in Margaret Horsting's name. There was no evidence as to when this account was closed.

The government presented checks signed by Margaret Horsting to Citicorp Mortgage. The government also presented a letter from a representative of Citicorp Mortgage regarding an account in the Horsting parents' names, but which does not explicitly relate to the 1727 property. The account number on the letter appears to match the number written by Margaret on the memo line of at least one of the checks. Also, the account history attached to the letter from Citicorp Mortgage notes the date of August 1, 1968, which is the same date as appears on the mortgage taken by the trustee on the 1727 property. Finally, there was no evidence of any other mortgage on which Margaret Horsting might have made payments in the mid-1980s. Therefore, the court finds that Margaret's checks to Citicorp Mortgage were to pay for a mortgage taken on the 1727 property.

[13]

According to Robert, Jr.'s testimony, Susan suffers from obsessive-compulsive disorder and schizophrenia.

[14]

In at least one instance, Susan paid the real estate taxes by cashier's check, which she paid for from her account.

[15]

The court finds Robert, Jr.'s testimony that he paid real estate taxes before the Horsting parents' deaths not credible, in light of contradictions between his testimony and the documentary evidence of payments from

In 1979, NSI and Margaret executed a Leasehold Agreement by which NSI leased the 1727 property to Margaret for fifteen years. The agreement makes no mention of Robert, Sr. in the typewritten portion of the lease, and was not signed by him. The agreement provides for rent equal to the amortized mortgage, taxes, insurance premiums, and other fees for the 1727 property. There is no documentary evidence that the lease was renewed upon its expiration in 1994.

There is likewise no credible evidence that the Horsting parents ever paid rent for the 1727 property. The Horsting children offer inconsistent testimony on this issue. Richard testified at trial that he was unaware of any rent paid by the Horsting parents to NSI, although he previously testified that his parents paid no rent to NSI. Robert, Jr. testified that the Horsting parents made rent payments, "some monthly, some quarterly, some every six months," but previously told Officer Baer that the Horsting parents did not pay rent. Moreover, there was no testimony regarding, or other evidence of, any regular rent payment procedure dictating when and to whom rent was to be paid. It is unclear how such payments would have been made, had they happened, given that the Horsting parents deposited their Social Security checks, which were their only source of income, into Susan's checking account, where they would be indistinguishable from any funds deposited by Susan. Finally, Officer Baer previously testified that Robert, Sr. told him in 1989 that he paid rent on the 1727 property. Given contradictory testimonial evidence and a virtual absence of evidence that the Horsting parents actually paid rent,[16] the court declines to conclude that the Horsting parents paid rent for the 1727 property.

Susan's account.

[16] The court is not persuaded that the Horsting parents paid rent based on by the Leasehold Agreement, given the absence of documentary evidence of actual payment, and the failure to renew the lease after its expiration.

Finally, Robert, Jr. testified that he paid over $300,000 in expenses related to taxes, repairs, a new roof, painting, and other costs of administration. However, as with the rent payments, he largely lacks receipts or other documentary support for these outlays.[17]

### E.    The Horsting parents' financial problems

Robert, Sr.'s financial woes began well before NSI's incorporation. From 1973 to 1990, nine civil judgments were entered against Robert, Sr. (and various other defendants) for a cumulative sum of over $600,000.[18] While private judgments piled up against Robert, Sr., the Horsting parents became debtors to the federal government as well. The IRS made a total of seven tax assessments against the Horsting parents in the years 1978 through 1983 and 1987 for a cumulative sum of over $800,000.[19] The Horsting parents failed to pay these assessments, even after entry of judgment against them; a total of $2,174,211.91 remained due in 2008. The Horsting parents fell behind on their payment of real estate taxes, as well: Robert, Jr. and Richard satisfied several years of outstanding real estate taxes after the Horsting parents' deaths.

---

[17]  As discussed above, NSI's Exhibits 7 and 15 are inadmissible hearsay. Several exhibits support Robert, Jr.'s payment of taxes on the 1727 property after the Horsting parents' deaths, but these taxes constitute only a small percentage of the expenses Robert, Jr. claims to have paid.

[18]  The first judgment for which evidence was presented was entered in 1973 in the amount of $4,596.83. In 1976, another civil judgment was entered against Robert, Sr. for $85,045.00. A third judgment followed in 1981 against Robert, Sr., Nott, and others for $32,568.32; a fourth, also in 1981, for $50,718.75; a fifth, in 1982, for $48,014.52; a sixth, in 1985, for $40,403.88; a seventh, in 1986, for $125,461.25; an eighth, in 1989, for $180,092.00; and a ninth, in 1990, for $62,107.18. There is some evidence that Robert, Sr. or other defendants to those suits may have satisfied some percentage of the judgments against them, but no evidence to undermine the inference that Robert, Sr. continued to owe several hundred thousand dollars in outstanding civil judgments.

[19]  In 1985, an assessment of $5,166.01 was made against the Horsting parents for income tax, penalties, and interest for the year 1982. Also in 1985, the IRS imposed an assessment of $1,466.07 against the Horsting parents for 1983. In 1986, the IRS imposed an assessment of $504,166.41 against the Horsting parents for the years 1978 through 1980. In 1987, the IRS made three assessments against the Horsting parents: of $181,515.65 for 1981; of $69,292.68 for 1982; and of $34,002.29 for 1983. Finally, in 1990, the IRS made an assessment of $7,333.15 against the Horsting parents for 1987.

## II. CONCLUSIONS OF LAW

### A.  Burden of Proof

The government bears the burden of proving its case by a preponderance of the evidence.  *Cf. United States v. Berman*, 825 F.2d 1053, 1057 (6th Cir. 1980).[20]

### B.  Federal Tax Liens

When the government makes assessments and the taxpayer's taxes remain unpaid after notice and demand, federal tax liens attach to "all property and rights to property, whether real or personal" of that taxpayer.  26 U.S.C. §§ 6321, 6322 (2006).  Tax liens are "continuing" and so attach to all property owned by the taxpayer during the life of the liens.  *Glass City Bank v. United States*, 326 U.S. 265, 267 (1945).  There is no question that tax liens attached to the Horsting parents' property when assessments were made between 1985 and 1990.  Rather, the question is whether the government has satisfied its burden of establishing that the 1727 property belonged to the Horsting parents.

---

[20]   NSI asserts that the government must prove its case by substantial evidence, but cites wrongful lien cases, rather than lien foreclosure cases, in support of its contention.

## C.    Applicable Law

The property rights of the taxpayer are determined by state law, because the federal tax lien statute does not define property rights, "but merely attaches consequences, federally defined, to rights created under state law." *United States v. Swan*, 467 F.3d 655, 656 (7th Cir. 2006) (quoting *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985)).   Federal law then "determines whether those rights are the sort of rights to which a lien attaches." *Id.* (quoting *United States v. Craft*, 535 U.S. 274, 278-79 (2002)).

Here, NSI held a beneficial interest in the 1727 property, which is personal property under Illinois law. *See United States v. Towne*, 406 F. Supp. 2d 928, 935 (N.D. Ill. 2005) (citing Illinois case law).[21]   The beneficiary of such an interest does not hold legal or equitable title under Illinois law, but still controls the property at issue, such that a tax lien that attaches to the beneficial interest also attaches to the real property, and therefore can be foreclosed against such property. *See United States v. Stamps*, 1993 WL 389041, at *3 (S.D. Ill. Jan. 15, 1993) (finding beneficial interest in Illinois land trust to subject the property to federal tax lien foreclosure); *see also Matter of Gladstone Glen*, 628 F.2d 1015, 1019 (7th Cir. 1980) ("Illinois law's characterization of the beneficiary's interest as personal property without legal or equitable title to the realty is not controlling

---

[21]    Defendants briefly argue that NSI's acquisition of the 1727 property insulates the property from liability under 26 U.S.C. § 6323(a), which provides that liens are invalid against purchasers of property until notice has been given.  This argument misses the mark.  First, the court has concluded that neither NSI nor Robert, Jr. purchased the beneficial interest in the land trust.  Moreover, the government argues that NSI was the alter ego or nominee of the Horsting parents.  If NSI were in fact the nominee or alter ego of the Horsting parents, its purchase of the beneficial interest in the land trust would not insulate it from liability, as the acquisition would be treated as if it were made by the Horsting parents (alter ego), or at the direction of the Horsting parents with an eye toward insulating the 1727 property from the Horsting parents' liabilities (nominee).  Therefore, defendants have failed to carry their burden to prove that they qualified as purchasers pursuant to § 6323(a). *See United States v. McCombs*, 928 F. Supp. 261 (W.D.N.Y. 1995).

for purposes of federal law."); *People v. Chi. Title & Trust Co.*, 389 N.E.2d 540, 545 (Ill. 1979) ("In examining a land trust it is apparent that true ownership lies with the beneficiaries though title lies with the trustee.").  Here, NSI, the owner of the beneficial interest in the land trust, is not the taxpayer; the Horsting parents are.  The government posits two theories to bridge this gap: that NSI was the alter ego of the Horsting parents, and that NSI was the nominee of the Horsting parents.  The court addresses each argument in turn.[22]

---

[22]

      While genuine issues of material fact rendered the nominee-alter ego analysis identical at the summary judgment stage, evidence presented at trial clarified the differences between NSI as a corporation (and the government's alter ego claim) and as a property holder (and the government's nominee claim).

### D.      Alter Ego

Federal tax liens attach to property held by the taxpayer's alter ego.  *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977).  While a corporation is presumed to be separate and distinct from its officers, shareholders, and directors, it may be the alter ego of another "when there is 'such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist' and when 'adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'"  *Judson Adkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (applying Illinois law) (citations, internal quotation marks, and alterations omitted).  In determining whether there is sufficient unity of interest to disregard the corporate form, Illinois courts consider several factors, including the capitalization of the corporation, its observance of corporate formalities, its failure to issue dividends, its source of funding, and the involvement of its officers and directors.  *Id.* (citing Illinois law).

NSI was a corporate fiction.  It was not capitalized at all–it had no money before the Horsting parents' deaths–despite a mortgage on the 1727 property.  Nor did it observe corporate formalities: NSI held no regular meetings of its shareholders, never held an election of directors, maintained no checking accounts, and kept scant records.  It paid no dividends at any time, and paid for purported corporate expenses through accounts held by the Horsting children, its shareholders.  That Robert, Jr. and his siblings kept NSI in good standing by observing the minimum formalities does not obscure that the corporation was a sham.

NSI's relationship with the 1727 property was particularly fictitious.  NSI paid no consideration for the property and paid no real estate taxes or property insurance.[23]  NSI

_____
[23] The government urges that the fact that the Horsting parents received the 1727 property's utilities in their names and paid those utilities is relevant to the question of whether they were renters or something more

also failed to collect any rent on the 1727 property, despite the Leasehold Agreement. While there are a few documents indicating NSI's beneficial interest in the land trust, nearly all other actions with respect to the 1727 property were taken by the Horsting parents or the Horsting children, not by NSI or someone acting on its behalf.

Although NSI was a corporate fiction, it does not automatically follow that NSI was the Horsting parents' alter ego. Courts generally impose liability for taxpayers' debts under an alter ego theory in three situations. The first is where the taxpayer maintained an interest in the sham corporation, whether as a shareholder, officer, or, in the case of a trust, a beneficial interest. *See, e.g.*, *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 289 (8th Cir. 1993); *see also United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999). Recognizing that the alter ego analysis concerns substance over form, courts also impose liability where the taxpayer, despite not maintaining an interest in the sham corporation, exerted complete control over it. *See, e.g.*, *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989). Finally, courts will consider a corporation the alter ego of a taxpayer even though the taxpayer does not have a formal position in or control of the corporation, where he used the corporation as his own bank account. *LiButti v. United States*, 107 F.3d 110, 118 (2d Cir. 1997).

In each of these situations the government can treat the corporation's assets as the taxpayer's because the taxpayer himself has done so. Indeed, the term alter ego signifies as much: "Alter ego means 'other self'–where one person or entity acts like, or, for another to the extent that they may be considered identical." *Scherping*, 187 F.3d at 801 (internal citation and quotation marks omitted).

---

than that. The court finds this argument of little force, as lessees often pay utilities (and receive utility bills in their names) for the properties they lease.

Here, the Horsting parents did not treat NSI as their "other self," and the government has not proven that NSI and the Horsting parents had such a unity of interest with the corporation that they are one in the same. Robert, Sr. was the incorporator of NSI, assigned an interest to his children, and oversaw the distribution of shares, but had no formal involvement with the corporation after its inception. Nor is there any evidence that the Hosting parents controlled NSI after Robert, Sr. assigned his interest to his children. The Horsting parents' actions concerned the 1727 property, not NSI. NSI leased the 1727 property to Margaret, as lessee. Margaret and Robert, Sr. paid the mortgage on the 1727 property, as well as real estate taxes, the latter through Susan's account. The Horsting parents did not take these actions on behalf of NSI: the mortgage was not taken or paid in NSI's name, and the checks made for the real estate taxes do not reference NSI. Whatever control the Horsting parents may have exerted over the 1727 property did not extend to the sham corporation, NSI. Finally, the Horsting parents did not treat NSI's finances as their own. NSI had no bank account, purchased no assets, and incurred no debts. The Horsting parents commingled their financial resources with those of others, such as Susan and, perhaps, Margaret's mother.[24] However, neither of these accounts belonged to NSI. The evidence is insufficient to conclude that NSI was the alter ego of the Horsting parents, and the government's alter ego theory therefore fails.[25]

---

[24] There was no evidence introduced as to whether the Horsting parents deposited any funds into Margaret's mother's account, or as to the source of the funds on which Margaret wrote the checks drawn on her mother's account.

[25] Because the court finds an insufficient unity of interest between NSI and the Horsting parents, it does not reach the second requirement of the alter ego test–*i.e.*, whether "adherence to the fiction of corporate existence would sanction a fraud or promote injustice." *Judson Atkinson Candies, Inc.*, 529 F.3d at 379 (internal citation and quotation marks omitted).

### E.    Nominee

The government also argues that NSI is the nominee of the Horsting parents. The nominee theory is concerned less with the relationship to the corporation than the alter ego theory is, and more with the asset at issue:

> A nominee theory involves the determination of the true beneficial ownership of property. An alter ego theory focuses more on those facts associated with a 'piercing the corporate veil' analysis. . . . Specific property in which a third person has legal title may be levied upon as a nominee of the taxpayer if the taxpayer in fact has beneficial ownership of the property.

*Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000) (per curiam) (citations and internal quotation marks omitted). Illinois law does not provide a clear standard for whether the nominal property holder is merely a nominee of another, but Illinois courts employ a "realistic approach" to property ownership that is consistent with the nominee doctrine. *Chi. Patrolmen's Ass'n v. Dep't of Revenue*, 664 N.E.2d 52, 57 (Ill. 1996) (collecting cases), *abrogated on other grounds by Carpetland U.S.A., Inc. v. Ill. Dep't of Employment Sec.*, 776 N.E.2d 166 (Ill. 2002). Because Illinois law does not adequately articulate the nominee test, this court follows the federal common law to the extent that federal law adds flesh to the state law bones. *See, e.g.*, *May v. United States*, 2007 WL 3287513, at *2 (11th Cir. Nov. 8, 2007); *see also Swan*, 467 F.3d at 658.

The court considers several factors in determining whether NSI is a nominee:

> (a) No consideration or inadequate consideration paid by the nominee; (b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property; (c) Close relationship between transferor and the nominee; (d) Failure to record conveyance; (e) Retention of possession by the transferor; and (f) Continued enjoyment by the transferor of benefits of the transferred property.

*Oxford Capital Corp.*, 211 F.3d at 284 n.1 (internal quotations and citations omitted); *see also Shades Ridge Holding Co.*, 888 F.2d at 729. Additional considerations include whether the taxpayer used the putative nominee's funds to satisfy his personal expenses, *see Hill v. United States*, 844 F. Supp. 263, 271 (W.D.N.C. 1993), whether the putative nominee interfered in any way with the taxpayer's use of the property, *see Cody v. United States*, 348 F. Supp. 2d 682, 694-95 (E.D. Va. 2004), whether the taxpayer held himself out as the owner of the property, whether the taxpayer pays real estate taxes and other maintenance charges, and whether the taxpayer pays the fair rental value of the property. *See Colby B. Found. v. United States*, 1997 WL 1046002, at *20 (D. Or. Oct. 22, 1997).

Here, several of the above-listed factors indicate that NSI was Robert, Sr.'s nominee. There was no evidence of consideration paid by NSI for the interest in the land trust. Before NSI's incorporation and the conveyance of the 1727 property, two judgments had been entered against Robert, Sr., and several other suits followed soon afterward. These financial woes, combined with the fact that Robert, Sr.–and not one of the Horsting children–incorporated NSI, suggests that the 1727 property was placed in NSI's name in anticipation of liens. Moreover, Robert, Sr., as the incorporator, had a very close relationship to NSI, and maintained a relationship with NSI through the corporation's early stages. The Horsting parents retained possession of the 1727 property, occupied it as their home for over thirty years, paid the property's mortgage, taxes, and insurance (through both Susan and Margaret's mother), personally guaranteed the mortgage on the property, and did not pay fair rental value for their occupation of the 1727 property. *See May v. A Parcel of Land*, 458 F. Supp. 2d 1324, 1338 (S.D. Ala.

2006), *aff'd sub nom. May v. United States*, 2007 WL 3287513. Finally, neither NSI nor its shareholders, the Horsting children, took any step to interfere with the Horsting parents' enjoyment of the property. Even Susan's payments of real estate taxes–the greatest indicator of control by the Horsting children–were funded by the Horsting parents' Social Security checks.

The principal fact weighing against the imposition of nominee status is that the Horsting parents never owned the 1727 property. *See United States v. Greer*, 383 F. Supp. 2d 861, 868 (W.D.N.C. 2005). However, while previous taxpayer ownership of the property at issue is common in nominee cases, it is not essential. *See Holman v. United States*, 505 F.3d 1060, 1064-65 (10th Cir. 2007); *see also Ott v. Home Savings & Loan Ass'n*, 265 F.2d 643, 647 (9th Cir. 1958) ("The word 'nominee' in its commonly accepted meaning connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in or ownership of the rights of the person nominating him.") (internal citation and quotation marks omitted). Indeed, were it otherwise, the nominee theory would be nearly inseparable from the transferee theory, which requires such a transfer. *See Oxford Capital Corp.*, 211 F.3d at 284.

Rather, the central inquiry of the nominee doctrine is "whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership." *Holman*, 505 F.3d at 1065. Here, Nott's conveyance to a corporation founded by his friend and owned by his friend's children is "not presumptively fishy," *Swan*, 467 F.3d at 658, but the timeline

of core events does not need the benefit of any presumption.[26]  Robert, Sr. incorporated NSI, then immediately transferred his interest in the corporation to the Horsting children. Barely two weeks later, Nott conveyed the interest in the land trust to NSI, which was now safely out of the hands of Robert, Sr. (and, therefore, of his judgment creditors). Not two weeks after the conveyance, the Horsting parents failed to pay their 1978 federal income taxes in a timely fashion.  Even after the conveyance, when the property was nominally in the possession of NSI, which was nominally in the hands of the Horsting children, Robert, Sr. continued to receive correspondence related to NSI's incorporation. The incorporation-assignment-conveyance sequence satisfies the requisite "legal fiction." *Holman*, 505 F.3d at 1065.  The fiction established, the Horsting parents continued to retain all of the benefits (and incur many of the costs) of true ownership of the 1727 property, as described above.  *See A Parcel of Land*, 458 F. Supp. 2d at 1338 ("At all times, the critical issue [in a nominee inquiry] is whether the taxpayer has active or substantial control over the property.") (citations omitted).

The court concludes that the government has met its burden to prove that NSI was the nominee of the Horsting parents, and accordingly enters judgment in the government's favor.

---

[26]

*Swan*, 467 F.3d 655, is distinguishable from the facts found here.  While *Swan*, like this case, involved taxpayers who occupied a property for several decades under successive owners, each of which was a family member or friend, the titular owner of the property in *Swan* paid nearly $300,000 for the property at issue, 467 F.3d at 657, while NSI paid nothing.  Moreover, the above-described sequence is the evidence of "a rat" that the government could not prove in *Swan*. *Id.* at 658.

### III. CONCLUSION

For the reasons stated above, the court enters judgment in favor of the government.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: November 5, 2009

22